### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MADONNA CHIAPALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-3375 |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Madonna Chiapale appeals from the denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Chiapale has filed a Motion for Summary Judgment (d/e 11), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 14) (collectively the Cross-Motions). This matter comes before the Court for a Report and Recommendation on the Cross-Motions. For the reasons set forth below, this Court recommends that the decision of the Commissioner should be AFFIRMED.

Chiapale was born on February 27, 1959.  R. 149.  She completed the eighth or ninth grade.  Answer (d/e 7), attached Certified Transcript of the Record of Proceedings before the Social Security Administration (R.) , 38, 517.  She can read and write.  She last worked on July 7, 2010, as a part-time in-home caregiver.   This part-time work did not constitute substantial gainful employment.  She has not engaged in substantial gainful employment since 2005.  R. 19.  Chiapale suffers from mood disorder, dysthymic disorder, status post heart attack, and status post left ankle fracture with chronic ankle pain.  R. 19, 427.

On November 21, 2008, Chiapale saw her primary care physician Dr. Majeshwar Prabhu, M.D. for a medication check and a follow-up examination for her hypertension.  R. 436.  Dr. Prabhu noted that Chiapale continued to have situational stress and anxiety.  Chiapale made good eye contact and "discussed issues quite candidly."  Dr. Prabhu noted that Chiapale understood "the sources of her stress and how to deal with it." R. 436.  Dr. Prabhu listed depressive disorder as an active problem for Chiapale.  Dr. Prabhu renewed her prescription for Fluoxetine (Prozac). R. 437.

Chiapale saw Dr. Prabhu regularly throughout the remainder of 2008 and through 2009.  Dr. Prabhu's notes indicate that the Fluoxetine prescription continued until late spring 2009.  R. 419-436.   Dr. Prabhu's notes for Chiapale's June 11, 2009, examination list depressive disorder as an active problem, but do not list a current prescription for Fluoxetine. R. 419.

Chiapale fractured her left ankle on or about November 23, 2008.  On November 23, 2008, Chiapale underwent open reduction and internal fixation surgery on her left ankle.  R. 322.  Dr. Mark Greatting, M.D., performed the surgery.  On January 15, 2009, she saw Dr. Greatting for a follow-up.  At that time, Dr. Greatting stated in his notes that she could start weight-bearing.  He also prescribed physical therapy.  R. 431.

On February 14, 2009, Chiapale suffered an acute myocardial infarction (heart attack).  R. 279-80.  On that date, she underwent a left heart catheterization, coronary angioplasty and drug eluting stent placement.  Dr. Adeeb Ahmed, M.D., performed the procedure.  R. 297. Chiapale remained in the hospital until February 16, 2009.  She felt well and was discharged on that date.  R. 296.  She was advised to quit smoking.  R. 294.

On February 19, 2009, she saw Dr. Greatting for a follow-up examination for her left ankle surgery. She reported that she was doing well. Her pain occurred occasionally and was "tolerable." R. 427. She reported no numbness, tingling, or burning. She stopped physical therapy. She reported that she had returned to her normal daily activities and was walking without assistance. Dr. Greatting advised her to continue her normal activities. R. 427.

On March 4, 2009, Chiapale underwent an exercise treadmill nuclear cardiac stress test. Chiapale had reported some chest pain and shortness of breath. The test results were negative for any reversible ischemia. R. 455-56.

On April 2, 2009, Chiapale went to the emergency room after she injured her right ankle. She was diagnosed with a right ankle sprain, but no fracture or dislocation. R. 343-44.

From June 11, 2009, to July 11, 2009, Chiapale wore a cardiac monitor. The monitor recorded no events during the month-long period. The monitor showed essentially benign results with no symptoms recorded. R. 454.

On September 22, 2009, Chiapale saw Dr. Ahmed for a six-month follow-up after her heart attack. Chiapale reported one incident of chest

tightness that was relieved with nitroglycerin.  She reported that she was smoking seven to ten cigarettes a day.  Dr. Ahmed scheduled her for a left heart catheterization.  On September 24, 2009, Chiapale underwent the catheterization.  The catheterization showed no significant artery disease with the stent in place in her right coronary artery and normal function of her left ventricle.  R. 417-18, 453.

On July 22, 2010, Chiapale saw Dr. Ahmed for a cardiac follow-up. Chiapale reported some chest pain in the previous week, relieved by nitroglycerin.  Chiapale reported that she quit smoking nine months earlier. Chiapale reported no other cardiac symptoms.  R. 411-12.

On July 23, 2010, Chiapale filed her application for SSI benefits. R. 149-54.  Chiapale alleged that her disability began on February 14, 2009.

On August 18, 2010, Chiapale completed a Function Report—Adult questionnaire.  R. 191-98.  Chiapale stated that she did not have the mental or physical strength since her heart attack to perform her prior work caring for the elderly.  R. 191.  Chiapale stated that he could care for her personal hygiene.  She stated that she prepared meals daily.  She stated that she dusted her home, washed dishes and washed the laundry.  She stated that she did her household cleaning once a week and took a nap

thereafter.  She stated that she did not do any yard work.  She went outside once or twice daily.  She drove a car and could handle her finances.  She shopped for groceries every two weeks.  A grocery shopping trip took two hours.  She no longer engaged in her hobby of fishing since her heart attack.  She reported that twice a week she visited with a friend at her kitchen table.  R. 191-94.  She reported that her condition affected her concentration, but did not affect her memory or understanding, her ability to complete tasks, or her ability to get along with others.  She did not know how far she could walk without stopping.  She reported that she had a fair ability to follow instructions and got along well with authority figures. R. 195-97.  She reported that she did not handle stress at all, could not handle changes in her routine, and she was afraid of being left alone "for fear of another heart attack or angina."  R. 197.

On August 19, 2010, Chiapale completed a Physical Impairments Questionnaire.  R. 208-09.  Chiapale reported that she had no problems with activities that involve the use of fine motor skills and manipulations. R. 208.  She reported that she got very weak when she had to reach overhead or above the waist.  R. 208.  She had no pain getting in or out of a car, a chair, a sofa, or a bed.  She reported that she could sit for at least

two hours as a time.  She reported that she needed a three-hour nap after doing her household chores.  R. 209.

On September 20, 2010, Dr. Charles Kenney, M.D., prepared a Physical Residual Functional Capacity Assessment for Chiapale.  R. 400-07.  Dr. Kenney opined that Chiapale could occasionally lift twenty pounds and frequently lift ten pounds; could stand and/or walk for six hours in an eight-hour workday; could frequently climb ramps and stairs, crouch, and kneel; and could occasionally climb ladders, ropes, and scaffolds. Dr. Kenney opined that Chiapale was limited in her abilities to use her lower extremities to push and/or pull due to her ankle fracture.  He also opined that Chiapale should avoid extreme cold.  He opined that she had no other physical exertional limitations.  R. 400-05.  On November 22, 2012, Dr. Francis Vincent, M.D., reaffirmed Dr. Kenney's opinions on reconsideration.  R. 461-63.

On November 4, 2010, Chiapale saw Dr. Ahmed for a cardiac follow-up.  Chiapale reported some chest tightness off and on for the prior three weeks.  She reported that she did not have shortness of breath or other cardiac symptoms.  Chiapale reported that she had stopped smoking more than a year earlier.  R. 409.  On November 9, 2010, Chiapale underwent an

exercise treadmill nuclear stress test.  The test results indicated a low probability of ischemia.  R. 449.

On January 27, 2011, Chiapale saw Dr. Ahmed for a cardiac follow-up.  She reported that she was doing good.  She said that she had no chest pains or shortness of breath.  She said that she had some depression, and Dr. Prabhu had started her on some depression medication.  She stopped taking the depression medication because she gained weight while taking it.  She reported that she still had some depression "but not that much." R. 465.

On November 10, 2011, and November 21, 2011, Chiapale went to the Christian County, Illinois, Mental Health Association for a walk-in crisis appointment.  She reported feeling depressed.  R. 510-13.[1]  She reported that she cried all the time and was overly sensitive.  She reported that she saw spiders, bugs, and monsters that others did not see.  R. 511.  Chiapale reported that she had not tried to hurt herself, but since her heart attack she often thought that she was going to die.  R. 511, 513.  She reported that she used to take Prozac, and the medication made her feel numb. R. 513.  She was referred to her primary care physician Dr. Prabhu to get a prescription for anti-depressant medication.  R. 510.

---

[1] The ALJ erroneously lists the dates of these visits in his decision as November 2012 instead of November 2011.  R. 23.

On December 1, 2011, Chiapale saw Dr. Prabhu.  Chiapale reported that she was very depressed since her heart attack.  She reported that she quit smoking.  She said that she went to the mental health clinic and they told her to see him.  She denied any suicidal ideations.  Chiapale requested antidepressant medication.  She reported that she took Prozac before without any problems.  Dr. Prabhu diagnosed depression and prescribed Fluoxetine, described as generic Prozac.  R. 490-91.

On December 16, 2011, Chiapale saw Dr. Prabhu for a cardiac follow-up.  Dr. Prabhu noted that Chiapale was smoking.  Dr. Prabhu noted that she had chronic depression.  Dr. Prabhu renewed her medications, including the Fluoxetine.  R. 488-89.  Dr. Prabhu's clinical summary indicated that he conducted a normal routine history and physical. Dr. Prabhu listed her assessed problems as coronary artery stenosis, hypothyroidism, depression, and benign hypertensive heart disease. R. 486.  Dr. Prabhu did not list Chiapale's post-surgical left ankle as an active problem.  R. 486, 494.

On March 9, 2012, Dr. Prabhu prepared a physical residual functional capacity questionnaire.  R. 498-503.   Dr. Prabhu listed depression as the only diagnosis for Chiapale.  Dr. Prabhu listed fatigue and inability to concentrate as her symptoms.  Dr. Prabhu identified occasional pain in

Chiapale's left ankle. Dr. Prabhu listed Chiapale's conditions as anxiety and depression. He opined that her symptoms constantly interfered with her attention and concentration. He opined that she was unable to tolerate even low stress jobs. He explained that Chiapale felt "stressed out." R. 500. Dr. Prabhu opined that Chiapale could: walk one city block without rest or severe pain; sit more than two hours at a time; stand for an hour at a time; stand/walk for less than two hours in an eight-hour workday; and sit at least six hours in an eight-hour workday. R. 501. Dr. Prabhu opined that during a workday, Chiapale would need to get up every ninety minutes and walk around for five minutes. R. 501. He opined that she would need a job that permitted shifting positions during the day, and she would need to take frequent, unscheduled breaks during the day. Dr. Prabhu opined that Chiapale would need to have her legs elevated with prolonged sitting. Her legs would need to be elevated eighteen inches above the floor. He opined that if she had a sedentary job, she would need her legs elevated 50% of the time. R. 502. Dr. Prabhu opined that Chiapale needed an assistive device to engage in occasional walking or standing. Dr. Prabhu opined that Chiapale could lift ten pounds. Dr. Prabhu opined that Chiapale had "significant limitations in repetitive reaching, handling or fingering." R. 502. Dr. Prabhu opined that Chiapale could grasp, turn or twist objects 15% of

the time at work; could engage in fine manipulations 15% of the time; and could reach 15% of the time.  Dr. Prabhu opined that Chiapale could not stoop or crouch at all.  R. 502.  Dr. Prabhu opined that Chiapale would have "good days" and "bad days" due to her impairments.  He further opined that she would be likely to be absent from work more than four times per month because of her impairments.  R. 503.  Dr. Prabhu opined that Chiapale needed to avoid extreme temperature, humidity, and noise. R. 503.

On March 21, 2012, the Administrative Law Judge (ALJ) conducted a hearing.  Chiapale appeared in person and with her attorney.  Vocational expert Dr. James Lanier, Ph.D. also appeared.

Chiapale testified at the hearing.  She testified that she lived with her husband in a one-story home.  She drove about once a week to go shopping.  R. 38.  She testified that she was not working because, "I'm very depressed, and I hurt.  I don't feel good."  R. 39.  Chiapale testified that she went to the Christian County Mental Health Association on two occasions, but they sent her back to Dr. Prabhu.  She testified, "They told me – well, I have hallucinations really bad, and they wanted my doctor to check into that."  R. 40.  The ALJ asked if she considered seeing a mental health professional.  She said she could not see a private doctor because she did

not have health insurance.  R. 43.  Chiapale testified that her medications were not helping her with her depression.  R. 44.

The ALJ asked Chiapale when the depression started.  The ALJ noted that the original claim focused on her physical problems.  Chiapale testified that she became depressed when she suffered her heart attack in 2009.  She testified that her doctor knew about her depression for a long time.  She testified that she had been on Prozac and went off of it.  She testified that she stopped taking the Prozac on her own.  She testified that she stopped taking Prozac because she believed the medication caused her to gain weight.  She testified that she is back on Prozac now.  R. 44-45.

The ALJ asked Chiapale about her physical condition.  She testified that she could not stand for very long because her ankles would swell. R. 46.  She testified that her left ankle would swell, "It swells if I'm up on it. And hurts.  If I'm up on it, it hurts."  R. 47.  She testified that her ankle would start to hurt if she stood for an hour.  R. 47.

Chiapale testified that she still had chest pains, "Probably I would say maybe six to seven times a month or so or it could be more.  I really don't know.  Never counted them."  When she has such chest pains, "[I]f I just sit and be quiet and take a nitro, then I can – it calms down."  R. 48.

Chiapale testified that she could take care of her personal hygiene. On a typical day she got up, had breakfast with her husband, and then sat on the couch and watched television. She testified that she and her husband shared the tasks of cooking, washing dishes, and cleaning the house. R. 50-51. She testified that her husband did most of the grocery shopping. She testified that she had not driven in a long time. R. 51. The ALJ asked Chiapale why she earlier testified that she drove once a week. She testified that she did not know how often she drove. R. 51. She testified that her girlfriend came to her house to visit. R. 52.

Chiapale testified that she could not stoop, crouch, or crawl because of her ankle. She testified that she could walk a block, but then would need to sit and rest. She testified that she needed to sit and rest because of her ankle and her hip. R. 53.

Chiapale testified that she was getting much worse lately, primarily because of her mental condition. She testified that she could not afford medical care. She testified that Dr. Prabhu allowed her to pay whatever she could afford, "He lets me pay whatever I can pay him. If it's $20, it $20. If it's $30, it's $30. It's just – that's what he does for me." R. 53.

Chiapale testified that she stopped smoking nine months after she had her heart attack in February 2009. R. 55. She testified that she had

not smoked at all since then.  R. 54.  She testified that the December 16, 2011, record from Dr. Prabhu indicating that she was still smoking was not correct.  R. 55.

The vocational expert Dr. Lanier then testified.  The ALJ asked Dr. Lanier the following hypothetical:

> Assume the past work same as claimant.  Exertional capacity limited to light work.  No climbing of ladders, ropes or scaffolds. Other postural functions could be performed occasionally. Occasional pushing or pulling the lower left extremity. Need to avoid concentrated exposure to extreme temperatures, both extreme cold and hot temperatures.  Need to avoid environmental hazards, such as unprotected heights and dangerous machinery.  Limitation to perform simple and repetitive tasks, involving little or no change in work routine.  No interaction with the general public.  Occasional interaction with coworkers and supervisors.  Past work would be out, correct?

R. 60.  Dr. Lanier responded, "Right."  The ALJ then asked,

> Now, we'll add the vocational factors by assuming that the hypothetical individual of the claimant's age, education and work history, would there be any unskilled, light jobs in the national and/or regional economy that such a person could perform?

R. 60.  Dr. Lanier opined that such a person could work as a collator operator, a routing clerk, or a mail clerk.  There were 3,600 collator jobs in the State and 51,000 nationally; 1,700 routing clerk jobs in the State and 112,000 nationally; and 1,200 mail clerks jobs in the State and 32,000

nationally.  R. 60-61.  Dr. Lanier opined that these three were representative positions all at the light work exertional level.

The ALJ then asked Dr. Lanier whether the person could perform these jobs if he needed to alternate sitting and standing periodically during the day.  Dr. Lanier opined that such a person could perform these three jobs even with that additional limitation.  R. 61.

Dr. Lanier opined that a person in these positions could be absent one and one-half days per month.  R. 61.

Chiapale's counsel asked Dr. Lanier whether a person could work if she would be off-task 15% of the workday because she needed to rest during the workday and because she was not able to concentrate or maintain persistence or pace.  Dr. Lanier opined that such a person could not work.  R. 61-62.  Dr. Lanier opined that a person in the three jobs he identified would need to be on-task 90 to 95 % of the workday.  Dr. Lanier opined that a person could not perform the jobs described if she needed to elevate her legs 50% of the time at work.  R. 62.  Dr. Lanier also opined that the jobs he identified did not require a minimum amount of standing. R. 62.

The ALJ stated that he would refer Chiapale for a consultative mental status examination.  The ALJ noted that the medical records did not contain

much information about Chiapale's depression.  R. 55-57.  The ALJ also asked Chiapale's counsel to provide any updates on Chiapale's medical records since December 2011.  R. 64.  The ALJ then concluded the hearing.

On April 3, 2012, Chiapale's counsel provided the records from the Christian County Mental Health Association of Chiapale's visits in November 2011.  R. 508.  The ALJ did not have those records at the time of the March 21, 2012, hearing.  R. 40.  Chiapale's counsel also provided records from Chiapale's March 9, 2012 appointment with Dr. Prabhu. R. 504-07.  Dr. Prabhu's records stated that, "Mrs. Chiapale came in to review her disability papers sent by her attorney."  R. 505.

On May 3, 2012, Chiapale saw psychologist Dr. Dolores Trello, Psy.D., for a consultative examination.  Chiapale reported that she had been depressed since her heart attack in February 2009.  She reported problems sleeping.  She reported that she sees spiders on the wall at night that she knew were not really there.  She reported crying spells and persistent sadness.  She reported having a bad temper.  She reported worrying about her health all the time.  R. 515.

On examination, Dr. Trello observed that Chiapale had a depressed affect.  She had some difficulty remembering dates.  Her conversations

were relevant and coherent. Dr. Trello concluded that the spiders were not hallucinations because Chiapale knew they were not real. Dr. Trello characterized the spiders as hypnagogic experiences. Chiapale's memory was fairly good. Dr. Trello diagnosed depressed mood and dysthymic disorder. Dr. Trello assigned a Global Assessment of Functioning (GAF) score of 50.[2] R. 516-17.

Dr. Trello also completed a form assessing Chiapale's mental limitations on her ability to perform work-related activities. Dr. Trello opined that Chiapale had mild restrictions on her ability to understand and carry out complex instructions, and mild restrictions on her ability to make judgments on complex work-related decisions. R. 519. Dr. Trello found no other limitations or restrictions from Chiapale's mental conditions. R. 520. Dr. Trello commented, "Mrs. Chiapale needs to be active as much as her doctors will allow. She may need to go to cardiac rehab to get moving and exercise. She will need therapy with a therapist to avoid letting her illness make her a cardiac cripple," and, "Mrs. Chiapale reported she feels depressed and anxious since her heart attack. She needs to regain her confidence in cardiac rehabilitation." R. 520.

---

[2] The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness. American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) at 32-35. The American Psychiatric Association no longer recommends use of the GAF score. Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On May 24, 2012, Chiapale's counsel asked for additional time to allow Dr. Prabhu to review and comment on Dr. Trello's report. R. 252. The record does not indicate whether the ALJ responded to this request, but, as discussed below, the ALJ stated in his decision that he decided not to grant the request. R. 25.

<u>THE DECISION OF THE ALJ</u>

On June 18, 2012, the ALJ issued his decision. R. 17-27. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ determined that Chiapale met her burden at Steps 1 and 2. She was not engaged in substantial gainful employment and she had the severe impairments of mood disorder, dysthymic disorder, status post heart attack, and chronic ankle pain. R. 19. The ALJ determined at Step 3 that Chiapale's impairments or combination of impairments did not meet or equal any Listing. R. 20-22.

The ALJ found at Step 4 that Chiapale had the RFC to perform a limited range of light work in which she would: have an option to sit or

stand equally throughout the day; only occasionally push or pull with her lower extremities; not climb ladders, ropes, or scaffolds; only occasionally perform postural functions such as stooping, crouching or crawling; avoid hazards; avoid concentrated exposure to extreme temperatures; and be limited to jobs involving simple and repetitive tasks involving little or no change in work routine.  R. 22.  The ALJ relied on the medical records from Drs. Greatting and Ahmed, the consultative examination of Dr. Trello, and the RFC analyses of Drs. Kenney and Vincent.  R. 23-25.  The ALJ also relied on Chiapale's report of her daily activities in her testimony and her August 18, 2010, Function Report.   The ALJ stated, "[T]he record reveals that Ms. Chiapale performs activities that demonstrate she can sit, stand, walk, lift items etc.  For example, she watches TV, drives, and performs some household chores."  R. 24.

The ALJ found that Chiapale's testimony about the debilitating effects of her pain was not credible.  The ALJ relied on the record of cardiac tests and examinations that were negative.  The ALJ also relied on Chiapale's level of daily activities.  The ALJ found that her claims of the extent of her pain were inconsistent with this evidence.  R. 24.

The ALJ gave very little weight to Dr. Prabhu's opinions set forth in his March 9, 2012, questionnaire.  The ALJ noted that Dr. Prabhu only

listed depression as a diagnosis in his March 9 opinions. The ALJ stated that the physical limitations in Dr. Prabhu's opinions were not supported in the medical records and not related to the depression diagnosis. The ALJ stated, "The undersigned notes that Dr. Prabhu has no real findings that would be supportive of his conclusory assertions; nor does the doctor have specialized qualifications to assess the claimant's mental functioning. Thus, Dr. Prabhu's conclusory and unsubstantiated assessment is given negligible weight." R. 24 (internal citations to the record omitted). The ALJ "concluded that there was no probative reason to do so." R. 25.

The ALJ explained that he ordered the consultative examination by Dr. Trello because of Dr. Prabhu's statements and Chiapale's testimony. R. 24. The ALJ acknowledged that Chiapale's counsel asked for an extension of time to allow Dr. Prabhu to comment on Dr. Trello's report. The ALJ stated,

> The Administrative Law Judge concluded there was no probative reason to do so. The claimant's family treating physician is a general practitioner who noted depressive symptoms generally; he is not a mental health professional. That is why the post-hearing consultative examination was ordered in the first place, to get input from a mental health professional. The undersigned considers that the general treating physician is in no position to critique the professional mental assessment of the consultative examiner.

R. 25.  The ALJ found at Step 4 that Chiapale could not perform her past work as a home health attendant.

The ALJ found that the Commissioner met her burden at Step 5.  The ALJ considered the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 1, and the testimony of vocational expert Lanier that a person of Chiapale's age, education, experience, and RFC could perform the representative occupations of collator operator, routing clerk, and mail clerk.  The ALJ concluded that Chiapale was not disabled.  R. 26.

Chiapale appealed the decision of the ALJ.  On September 13, 2013, the Appeals Council denied Chiapale's request for review.  The decision of the ALJ then became the final decision of the Commissioner.  R. 1. Chiapale then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

        In this case, the ALJ's decision is supported by substantial evidence.

Chiapale does not challenge the findings at Steps 1-3.  The RFC

determination at Step 4 is supported by the medical records from Drs.

Greatting and Ahmed, as well as the opinions of Drs. Kenney, Vincent, and

Trello.  The records from Dr. Greatting indicated that Chiapale recovered

from her ankle surgery.  She returned to her normal activities with only

occasional, tolerable pain.  The records from Dr. Ahmed showed some

occasional cardiac pain that responded to medication, but the subsequent

stress tests and catheterization were all negative for further ischemia.

Drs. Kenney and Vincent opined that Chiapale could perform light work

with limitations consistent with the ALJ's RFC determination.  Dr. Trello

opined that Chiapale's depressive disorder subjected her to mild

restrictions on her ability to understand and follow complex instructions and make complex decisions.  R. 519-20.  The ALJ's RFC limitation to simple repetitive tasks was consistent with those findings.

Chiapale's August 18, 2010 Adult Function Report also supported the RFC determination.  Chiapale reported that her condition affected her concentration, but not her memory, understanding or ability to complete tasks.  She further reported that she had a fair ability to follow instructions. She reported that she could not handle stress and changes in routine. R. 195-97.  These reported limitations are consistent with the ALJ's provisions in the RFC that limited her to simple repetitive tasks with little or no changes in routine.  R. 22.

Dr. Lanier's testimony supported the ALJ's findings at Steps 4 and 5 that she could not perform her past job as an in-home caregiver, but could perform a significant number of jobs in the national economy.  The decision was supported by substantial evidence.

Chiapale argues that the ALJ erred in giving only negligible weight to Dr. Prabhu's March 9, 2012 opinions.  The Court disagrees.  The opinions of a treating physician regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.

20 C.F.R. § 404.1527(d)(2).   In this case, Dr. Prabhu's March 9, 2012 opinions were not supported by medical findings.  Dr. Prabhu opined that Chiapale was subject to significant exertional limitations:  she could only walk a block; she needed to get up every ninety minutes and walk around; she needed to have her legs elevated; she needed an assistive device to walk or stand even occasionally; she had significant limitations in reaching, handling or fingering; she was limited in her ability to grasp, twist, and engage in fine motor skills.  Chiapale cites to no medical evidence in the record to support any of these opinions.  Dr. Ahmed's cardiac examinations and subsequent stress tests and catheterization were all negative and do not support a finding of any such limitations.  Dr. Greatting's records show she largely recovered from her ankle surgery.  Chiapale fails to cite anything in Dr. Prabhu's treatment notes that indicates she had any condition that would cause these types of physical limitations.  In light of the dearth of any medical evidence to support these opinions, the ALJ did not err is giving only negligible weight to these opinions.

Dr. Prabhu's non-exertional limitations are also not well supported by medical evidence and are contrary to other evidence in the record. Dr. Prabhu opined that Chiapale's anxiety and depression interfered with her concentration and attention.  Dr. Prabhu opined that she could not

tolerate even a low stress job.  R. 500.  These opinions are contrary to Chiapale's statements in her August 18, 2010 Adult Function Report.  She stated that her conditions affected her concentration, but did not affect her memory, understanding, or ability to complete tasks.  She further stated that she had a fair ability to understand instructions and got along well with others and with authority figures.  R. 195-97.  Dr. Prabhu's opinions are inconsistent with these statements.

The medical records do not support Dr. Prabhu's opinions of the severity of Chiapale's depression.  Dr. Prabhu diagnosed depression in 2008 and 2009, but did not prescribe any medication or other treatment for this condition beginning in June 2009.  In January 2011, Chiapale reported to Dr. Ahmed that she stopped taking the depression medication because she gained weight while taking it.  Chiapale further told Dr. Ahmed that she still had some depression "but not that much."  R. 465.  These medical records indicate a much less severe condition than indicated by Dr. Prabhu's opinions.

The later medical evidence indicates that Chiapale suffered from depression, but does not support the level of functional limitations contained in Dr. Prabhu's opinions.  In November 2011, Chiapale reported severe depression symptoms to the Christian County Mental Health

Association, but its representatives did not treat her or fully evaluate her.

Rather, those representatives referred Chiapale to her physician,

Dr. Prabhu. Dr. Prabhu saw Chiapale twice in December 2011.

Dr. Prabhu stated that Chiapale came to his office to request a prescription

depression medication. R. 490. Dr. Prabhu prescribed Fluoxetine, but his

treatment notes do not contain any observations or findings that support his

March 2012 opinions of the severity of Chiapale's condition.[3] Once again,

there is a dearth of medical evidence to support Dr. Prabhu's opinions.

Dr. Prabhu's opinions were not well supported by medical evidence and

were inconsistent with Chiapale's Adult Function Report. The ALJ did not

err in deciding to give those opinions only negligible weight.

Chiapale complains that the ALJ did not give Dr. Prabhu the

opportunity to review and comment on Dr. Trello's report. The Court sees

no error in this decision. The ALJ evaluates the evidence in the record. He

could evaluate the opinions of both Dr. Trello and Dr. Prabhu. There was

no error.

---

[3] The Court further notes that Dr. Prabhu did not treat Chiapale again from December 16, 2011 through April 3, 2012, even to check the effectiveness or dosage of the Fluoxetine. Chiapale testified that her financial condition did not limit her ability to see Dr. Prabhu. Chiapale testified that Dr. Prabhu would see her and let her to pay what she could. R. 53. Thus, Chiapale could have seen Dr. Prabhu again if she continued to have these significant symptoms. The ALJ asked at the hearing for an update of Dr. Prabhu's treatment notes after December 2011. There were none. The only additional note was a meeting on March 9, 2012 to go over the papers from her lawyer.

Chiapale argues that the ALJ erred in interpreting Dr. Lanier's testimony. The Court disagrees. Dr. Lanier identified three jobs as being at the light exertional level that met the additional limitations set forth in the ALJ's RFC: collator operator, routing clerk, and mail clerk. Dr. Lanier identified specific jobs listed in the Dictionary of Occupational Titles (DOT) maintained by the Department of Labor. R. 60-61. The DOT rates all of those jobs as light exertional jobs. DOT, Job Listings: 208.685-010, Collator Operator; 222.687-022; Routing Clerk; and 209.687-026 Mail Clerk, available at www.occupationalinfo.org., viewed November 6, 2014 The ALJ did not err in understanding that the jobs identified by Dr. Lanier were light exertional jobs and that the jobs met the RFC limitations formulated by the ALJ. There was no error. Chiapale's arguments to the contrary are not persuasive.

Chiapale last argues that the ALJ erred in her credibility finding. This Court does not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder, 529 F.3d at 413-14. The ALJ may choose to not accept a claimant's claims of pain "insofar as they clash with other, objective medical evidence in the record." Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007). In addition,

"[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."  Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008).

In this case, Chiapale's testimony regarding her ankle pain conflicted with the medical evidence.  Chiapale testified that her post-surgical ankle caused her pain that limited her functional capacity.  Chiapale testified that she could only stand for an hour at a time because her ankle swelled.  She further testified that she could not stoop, crouch, or crawl because of her ankle and could only walk a block before she had to rest because of her ankle and her hip.  R. 46, 47, 53.

The ALJ could reasonably conclude that the medical evidence regarding her ankle conflicted with Chiapale's testimony.  Dr. Greatting's records indicated that the ankle was healed in February 2009 and only caused occasional pain that Chiapale characterized as "tolerable."  R. 427.  Chiapale never saw Dr. Greatting again about her ankle.  In contrast, she saw Dr. Ahmed several times to follow up on her cardiac condition.  R. 409-10, 411-12, 417-18, 415-16, 425-26, 438-56, 465-82.  Chiapale saw Dr. Prabhu at least five times after February 2009 for various complaints, and his notes do not indicate that she ever mentioned her ankle.  R. 413, 421, 423, 486.  On the last day Dr. Prabhu treated Chiapale, December 16,

2011, Dr. Prabhu performed a routine physical and listed Chiapale's cardiac condition and her depression in his assessment, but not her post-surgical ankle. R. 486, 494. Dr. Prabhu's office records from December 16, 2011, also listed Chiapale's cardiac condition and depression as chronic problems, but not the left ankle. Dr. Prabhu did not list Chiapale's hip as a health problem at all. R. 494. The conflict between this medical evidence and Chiapale's testimony provided substantial evidence for the ALJ's credibility determination.

Chiapale did not testify that her cardiac condition caused material functional limitations. She testified that she had chest pain six or seven times a month, but the pain was alleviated by sitting quietly and taking her nitroglycerin medication. R. 48. She did not testify that her chest pain caused any other functional limitations. R. 48. Having pain once or twice a week that was controlled by sitting and taking medication is consistent with the ALJ's RFC determination that she could perform a limited range of light work in which she had the option to sit. In addition, the objective medical test results from her repeated stress tests and subsequent catheterization were all negative. Thus, to the extent that she testified that her cardiac condition further limited her functional abilities, such testimony would "clash" with the objective medical evidence. Arnold, 473 F.3d at 823.

The ALJ also discounted the credibility of Chiapale's testimony regarding the debilitating effects of her mental condition. Chiapale testified that she spent her days on the couch because she did not "have the mental ability to get up or do anything else." R. 45. This testimony conflicted with Dr. Trello's assessment. The testimony also conflicted with Chiapale's August 18, 2010 Function Report in which she stated that she did not have any problems completing tasks. R. 195-97. The conflict between Chiapale's testimony and other evidence provided substantial evidence to support the ALJ's credibility determination.

Chiapale complains that the ALJ improperly relied on Chiapale's daily activities. A claimant's daily activities are relevant to the issue of credibility. SSR 96-7p. The ALJ, however, cannot rely on a claimant's ability to engage in activities of daily living alone as proof that claims of debilitating pain are not credible. The ALJ cannot equate the ability to engage in activities of daily living with the physical and mental requirements of working. See Bjornson v. Astrue, 671 F.3d 640, 646 (7th Cir. 2013). In this case, the ALJ may have emphasized Chiapale's daily activities as a basis for his credibility determination. The ALJ, however, also relied on the conflicts with the medical evidence. R. 24-25. The conflicts between Chiapale's testimony and the medical evidence discussed above provide

support in the record for the credibility finding.  The Court, therefore, should not review that finding.  <u>Elder</u>, 529 F.3d at 413-14.

THEREFORE THIS COURT RECOMMENDS THAT Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 14) should be ALLOWED, and Plaintiff's Motion for Summary Judgment (d/e 11) should be DENIED.  The decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local Rule</u> 72.2.

ENTER:  March 17, 2015


_____*s/ Tom Schanzle-Haskins*_____
UNITED STATES MAGISTRATE JUDGE